Thomas A. Gentile, Esq. (TG-6939)
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
200 Campus Drive, Fourth Floor
Florham Park, New Jersey 07932
Phone:  (973) 735-5785
Fax:  (973) 624-0808
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISCTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KALYPSYS, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>BLUE LABEL SOLUTIONS, LLC,<br><br>*Defendant.* | Docket No. _____<br><br>Civil Action<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff KALYPSYS, LLC ("Kalypsys" or "Plaintiff"), by and through its undersigned counsel, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, by way of Complaint against the Defendant, BLUE LABEL SOLUTIONS, LLC d/b/a/ Blue Label Labs ("Blue Label" or "Defendant"), hereby alleges the following:

**THE PARTIES**

1.    Kalypsys is a New Jersey limited liability company having its principal place of business within the State of New Jersey.  Kalypsys is engaged in the business of providing software solutions in the medical space, including (without limitation) a website and downloadable mobile applications for booking healthcare appointments.

2.    Blue Label is a Washington limited liability company that, upon information and belief, has its principal place of business within the State of Washington.  Blue Label is engaged in the business of software development, which services Blue Label offers to the public.

1

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1), because complete diversity of citizenship exists between Kalypsys (Washington) and Blue Label (New Jersey); and the amount in controversy is in excess of $75,000.  Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(a)(2), because this is the district where a substantial part of the events or omissions giving rise to this Complaint occurred.

4.      Although this action involves a putative contract that contains a putative arbitration clause, this Court has jurisdiction over this action because Blue Label fraudulently induced Kalypsys both to sign the putative contract (*see* ¶¶ 13-16, *infra*) and (specifically) to include the putative arbitration clause in that putative contract (*see* ¶ 17, *infra*).

## THE PROPOSAL AND THE PUTATIVE MSA

5.      During or about December of 2019, Kalypsys and Blue Label had discussions about Kalypsys engaging Blue Label to develop for Kalypsys an app that would allow patients to interface directly with health care providers (the "Project").

6.      Pursuant to these discussions, Blue Label prepared for Kalypsys a document entitled "Service Estimate" (the "Proposal") that listed the Blue Label staff members who would work on the Project.  Attached to this Complaint as **Exhibit A** is a true and correct copy of the Proposal.

7.       The Proposal set forth the estimated time that each Blue Label staff member would devote to the Project in terms of hours to be worked per month.  One of the Proposal's listed staff members was the "Quality Assurance Staffer." The Proposal stated that the Quality Assurance Staffer would work 160 hours per month for four months.

8.      The Proposal stated that Blue Label would provide "Security Testing."

9.      The Proposal stated that the entire Project would take four months to complete.

10.     In multiple discussions between Blue Label and Kalypsys, Blue Label (specifically, and without limitation, Zach Drew, Stewart Skrondal and Daniel Deserto) stated to the owners of Kalypsys (Dr. Amr Hosny and Dr. David Chu) that a Quality Assurance Engineer ("QAE") would be working on the Project full-time.

11.     It is the standard practice in the software development industry for a software developer to provide adequate quality assurance to the kind of project that Blue Label proposed to develop for Kalypsys, including (without limitation), dedicating a QAE to the Project.

12.     On or about January 14, 2020, Kalypsys and Blue Label signed a putative contract bearing the title "Master Services Agreement" (the "Putative MSA").  Attached to this Complaint as **Exhibit B** is a true and correct copy of the Putative MSA.

13.     Kalypsys signed the Putative MSA in direct reliance upon various statements that Blue Label made to Kalypsys.  Such communications included (without limitation) the Proposal (which stated in writing that a Blue Label QAE would be devoting to the Project 160 hours per month for four months, and that Blue Label would provide "Security Testing"); and repeated verbal assurances that there would be a dedicated QAE.

14.     On information and belief, Blue Label made the foregoing statements to Kalypsys with the intent of not providing adequate quality assurance and Security Testing to the Project, including (without limitation), the intent not to dedicate a QAE to the Project.

15.     Kalypsys would never have signed the Putative MSA if Kalypsys had been aware that Blue Label never intended to provide adequate quality assurance and Security Testing to the Project, including (without limitation), the intent not to dedicate a QAE to the Project.

2569086v.1

16.     Blue Label's conduct (including, without limitation, Blue Label's statements concerning quality assurance, a dedicated QAE and Security Testing, as set forth *supra*) fraudulently induced Kalypsys to sign the Putative MSA.  Therefore the Putative MSA is void *ab initio*.

17.     The Putative MSA contains a putative arbitration clause.  Blue Label also fraudulently (and specifically) induced Kalypsys to agree to the putative arbitration clause.  Specifically (and without limitation), after having reviewed a draft of the Putative MSA, Dr. Amr Hosny of Kalypsys spoke with Stewart Skrondal of Blue Label.  In that conversation, Dr. Hosny (among other things) objected to the fact that the putative arbitration clause provided for arbitration in the State of Washington.  Dr. Hosny requested that the putative arbitration clause be changed to provide for arbitration in New Jersey.  Stewart Skrondal of Blue Label responded by telling Dr. Hosny: "Don't worry, we've never had to use it."  Without limitation, this assurance, coupled with Blue Label's statements concerning quality assurance (*supra*), induced Kalypsys to include the putative arbitration clause in the Putative MSA that Kalypsys signed.  Kalypsys never would have agreed to include such a putative arbitration clause in the in the Putative MSA that Kalypsys signed absent such assurances from Blue Label.

**BLUE LABEL FAILED TO DELIVER QUALITY OR SECURITY**

18.     Blue Label provided inadequate quality assurance to the Project, including (without limitation), intentionally not devoting a QAE to the Project.  This became apparent to Kalypsys in or about August of 2020, when Blue Label intentionally released the software with no quality assurance testing whatsoever.  This resulted in the need for multiple revisions, which both greatly extended the development time and brought about great cost to Kalypsys.

19.     In or about August and/or September of 2020, Zach Drew, a partner/owner at Blue Label, repeatedly approached the partners/owners of Kalypsys (Dr. Hosny and Dr. Chu) seeking to

4

acquire an ownership interest in Kalypsys.  Specifically, Zach Drew sought to obtain for Blue Label an equity interest in Kalypsys in exchange for discounting the amount to be paid by Kalypsys.  Blue Label went so far as to tender a "Safe Agreement" to Kalypsys.  Meanwhile, Blue Label taking a significantly longer time to deliver any product to Kalypsys.

20.     Dr. Hosny and Dr. Chu became suspicious that Blue Label was intentionally slowing development of the Project in order to financially stress Kalypsys, thereby pressuring Kalypsys into signing the Safe Agreement.  Dr. Hosny and Dr. Chu became suspicious that this had been Blue Label's plan all along (including, without limitation, before the signing of the Putative MSA) in not providing adequate quality assurance or security to Project.

21.     In or about April of 2021, Blue Label (specifically, and without limitation, Daniel Deserto and Dulio Denis) admitted to the partners/owners of Kalypsys (Dr. Amr Hosny and Dr. David Chu) that there had been no QAE (at all, even part-time) on the Project since September of 2020; and could not confirm if there had ever been a dedicated QAE on the Project.

22.     In or about June of 2021, Daniel Deserto of Blue Label admitted in front of Dr. Hosny, Dr. Chu and Jordon Guerreri (the CEO of Blue Label) that Blue Label had never had a dedicated QAE on the Project.

23.     In or about [month] of 2021, Kalypsys still did not have a working product.  In or about [month] of 2021, Kalypsys separated from Blue Label.  Kalypsys never received from Blue Label a functioning product.

24.     Blue Label also provided inadequate security to the Project.  Kalypsys has experienced repeated and costly security problems on the Project.  Such problems have (among other things) made it difficult for Kalypsys to obtain insurance.

25.     The original cost estimate for the Project set forth in the Proposal was $195,500.00. Kalypsys has paid Blue Label in excess of $450,000.00.  Kalypsys has incurred significant additional costs in attempting to get the product to work, in an amount no less than an additional $135,000.00.

## COUNT ONE
### (Common Law Fraud)

26.     Kalypsys restates and re-alleges the allegations set forth in paragraphs 1 through 25, *supra*, as if set forth fully in this paragraph.

27.     Blue Label materially misrepresented to Kalypsys (in the Proposal, in verbal communications, and otherwise) that Kalypsys intended to provide adequate quality assurance and security to the Project, including (without limitation), that Kalypsys intended to dedicate QAE to the Project.  Blue Label intended all along (including, without limitation, before the signing of the Putative MSA) not to provide adequate quality assurance or security to Project (including, without limitation, not to dedicate QAE to the Project).

28.     Blue Label made these material misrepresentations with knowledge of their falsity.

29.     Blue Label made these material misrepresentations with the intention that Kalypsys would rely upon them, including (without limitation) the intention to fraudulently induce  Kalypsys to sign the Putative MSA in reliance upon those material misrepresentations.

30.     Kalypsys did rely upon those material misrepresentations by (without limitation) signing the Putative MSA and engaging Kalypsys on the Project.

31.     As a direct and proximate result of the foregoing, Kalypsys has described damages as set forth herein, in an amount no less than $585,000.00.

**COUNT TWO**
**(Violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*.)**

32.     Kalypsys restates and re-alleges the allegations set forth in paragraphs 1 through 31, *supra*, as if set forth fully in this paragraph.

33.     Blue Label offers to the public software development services that are subject to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*.

34.     Blue Label acted unlawfully, and in violation of the New Jersey Consumer Fraud Act, by affirmatively misrepresenting to Kalypsys (in the Proposal, in verbal communications, and otherwise) that Kalypsys intended to provide adequate quality assurance and security to the Project, including (without limitation), that Kalypsys intended to dedicate QAE to the Project.

35.     In fact, Blue Label intended all along (including, without limitation, before the signing of the Putative MSA) not to provide adequate quality assurance and security to the Project (including, without limitation, not to dedicate QAE to the Project).

36.     Blue Label's unlawful conduct in violation of the New Jersey Consumer Fraud Act (including, without limitation, Blue Label's statements concerning quality assurance and a dedicated QAE, as set forth *supra*), directly and proximately caused Kalypsys to sustain an ascertainable loss, as described herein, in an amount no less than $585,000.00.

**COUNT THREE**
**(Unjust Enrichment)**

37.     Kalypsys restates and re-alleges the allegations set forth in paragraphs 1 through 36, *supra*, as if set forth fully in this paragraph.

38.     Kalypsys has paid Blue Label in excess of $450,000.00 on the Project, yet Kalypsys never received from Blue Label a functioning product.

7

39.     Blue Label has knowingly received the benefit of payment from Kalypsys in excess of $450,000.00 Kalypsys reasonably expected that Blue Label would deliver to Kalypsys a functioning product, but Kalypsys never received from Blue Label a functioning product.

40.     In light of the foregoing, Blue Label's retention of the benefit of payment from Kalypsys in excess of $450,000.00 inequitable.

41.     Blue Label has been unjustly enriched by its retention of payment from Kalypsys in excess of $450,000.00.  Blue Label's failure to deliver a functioning product to Kalypsys has therefore unjustly enriched Blue Label.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, KALYPSYS, LLC, hereby, prays respectfully that this Honorable Court grant to Kalypsys the following relief:

A.     A declaratory judgment declaring that the Putative MSA is void *ab initio*;

B.     Judgment in favor of Kalypsys, and against the Defendant, BLUE LABEL SOLUTIONS, LLC, as to each Count asserted herein;

C.     An award of compensatory damages in favor of Kalypsys in an amount no less than $585,000.00; and a further **trebling** of such damages, plus attorneys' fees,  under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*.;

D.     An award granting to Kalypsys all attorneys' fees, costs, and expenses in this action allowable under applicable law;

E.     All other relief permitted under applicable law; and

F.     All other relief that this Honorable Court may deem just and proper.

8

Dated:  February 1, 2022

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By:    /s/ Thomas A. Gentile
        THOMAS A. GENTILE (TG-6939)

*An Attorney Admitted to Practice before this Honorable Court*

200 Campus Drive, Fourth Floor
Florham Park, New Jersey 07932
Phone:  (973) 735-5785
Fax:  (973) 624-0808

*Attorneys for Plaintiff, Kalypsys LLC*

## JURY DEMAND

Pursuant to Rule 38(b)(1) of the Federal Rules of Civil Procedure, Plaintiff KALYPSYS,

LLC, hereby demands a **TRIAL BY JURY** of all counts that may be so tried.

Dated:  February 1, 2022

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By:    /s/ Thomas A. Gentile
        THOMAS A. GENTILE (TG-6939)

# EXHIBIT **A**

12/20/19

# Service Estimate for Kalypsys





**Blue Label**
LABS

2

At Blue Label Labs, we partner with the best entrepreneurs and businesses to solve everyday problems through a creative and conscientious use of technology.

Blue Label
LABS

3

# The Blue Label Labs Promise

**Blue Label**
LABS

4

At Blue Label Labs, we understand that the decision to build a new product, and the team you choose to build it with, is a crucial, and even scary decision.

That's why we give you our promise: to do our very best and to always strive to do the right thing for your product, your users and your team.

We want you to think of us as your partners in this journey. So ask us anything!

**Blue Label**
LABS

5

# Doing Your Part, to Make it All Work.

**Blue Label**
LABS

6

# 1. Be Nice.

The best professionals love what they do. At Blue Label Labs we aim to create an enjoyable workspace so that we can recruit and keep the very best. Working only with nice clients is part of that!

# 2. Challenge Us.

We love to be challenged! Please share your vision with us, and hold us to a high creative and technical standard. Come to us with problems, so we can solve them together.

# 3. Learn from Us.

An average Blue Label Labs team has built and launched dozens of great products. We've seen many successes and some failures. We're happy to share our experience!

# 4. Decide Promptly.

In the world of software, we've learned it's often better to make the wrong decision than to make no decision at all. Wrong decisions can usually be corrected more easily than starting from scratch!

# 5. Seek Feedback Early.

Blue Label Labs uses Lean Design principles alongside Agile Development methodologies. This means we'll be seeking user feedback early, often, and for the life of the project. Please help us obtain and address user feedback to increase your likelihood of success.

**Blue Label**
LABS

7

# How We Work

**Blue Label**
LABS





# 1   Scoping & Contracting

Our Client Solutions Team works with you to scope your product and produce estimates and contracts.





## 2    Design Sprint

Inspired by the now-famous, Google Ventures methodology, some engagements start with an intense, 5-full day discovery process that ends with empirical validation with real (or potential) clients.

Note: Not included in this estimate



## 3 Strategy & User Experience Design

Using the insights from the Design Sprint or our discovery process, our UX Design Team fleshes out the user journeys, and starts to design a clear, seamless & delightful experience.





# Building a User Story Map

Building a User Story map will help us identify the ideal human-centered approach and best feature set to give your users the most value at launch.

Competitive Analysis
Develop user personas
Analyze and document user tasks
Add and organize user stories
Determine core flows to test

12

# Lean Design Sprints

Blue Label Labs uses Lean Design methodologies, which prioritize rapid learning and a focus on testing core assumption quickly via the creation of an MVP: a Minimal Viable Product.



**Blue Label**
LABS



## 4  Visual Design & Branding

Our Visual Design Team works to create an elegant, user-centric design system & brand identity that incorporates the latest trends and is focused on connecting with your customer.



## 5 User Testing

Our team uses interviews, field surveys and other methods to get feedback and iterate on the designs before moving into development.





## Prototypes & User Interviews

We conduct multiple rounds of user interviews. Using Invision prototypes to validate assumptions, flows, and usability with our UX Researchers.

Lo-Fi prototype + user interviews
Build a visual design language
Hi-Fi prototype + user interviews
Qualitative usability testing



## 6    Development & Testing

Agility is the name of the game. Our Scrum-based Agile Methodology ensures frequent product releases to users and allows for continuous testing and product adjustments.

17

# Agile Methodology

Blue Label Labs uses Scrum*, the software industry's ruling Agile Development methodology, to ensure timely delivery and continuous learning via frequent software builds and constant feedback.

This means that development is broken into 2 to 3-week sprints, with each sprint producing a new software build that is tested and potentially shippable (i.e., in working order and internally consistent).

This gives you the change to test, learn, get feedback, and influence the roadmap throughout the development effort, and not just at the end.



* You can learn more about Scrum here: https://www.scrum.org/resources/what-is-scrum

18

# Testing & QA

Blue Label Labs engages in continual testing of your app throughout the development process.* Our dedicated test team will devise a test plan and provide:

Module Testing

Unit Testing

Regression Testing

Web Server Integration Testing

Security Testing

Performance and Load Testing

Bug Fixing

* Test builds are distributed by TestFlight (for iOS), Android App Installer (for Android), and staging servers for the web



# 7 Deployment & Launch

Getting an app live on the web or in an app store can be a tricky process. We help every step of the way to get your product in market and execute a launch strategy--so that you can start monetizing.



**8**   Tracking & Analytics

Updates are essential to an app's success. Using both qualitative and quantitative tracking tools, we help you to identify opportunities to improve the app based on user feedback and data.

Note: Not included in this estimate



## 9    Marketing & Growth Strategy

No app launch plan is complete without proper marketing, PR and user engagement tools to aid in discovery and to retain users. We help plan and execute on a growth strategy.

Note: Not included in this estimate



## 10  Continuous Improvement

Only those apps that take in user feedback and track user behavior are successful. Launch day is when the real work begins. But don't worry, we're here to support you for the long-term.

Note: Not included in this estimate

23

# The Project Goals

**Blue Label**
LABS

24

# Kalypsys has the following stated goals:

- Build a convenient and comprehensive resource for patients to efficiently find credentials, online reviews, and real time availability of local medical providers.

- Provide a targeted referral source for practitioners with patients that are appropriately triaged, resulting in a reduction of unnecessary appointments and improve both patient and provider satisfaction.

- Create a cost effective platform for individual doctors to create relevant medical content that directly translates into referrals

- Build an educational resource for patients regarding all things medical: insurance benefits and policies, traditional vs alternative medicine, health and wellness.

- We've collected the user stories for the design and development of Kalypsys here: http://bit.ly/357MEIi

Blue Label
LABS

25

# Target Platforms, Operating Systems & Technology

**Web:**          Modern Browsers          Wordpress



**Blue Label**
LABS

26

# Supported Devices

The three latest versions of:

**Browsers**       Mozilla Firefox  ·  Google Chrome  ·

Internet Explorer ·  Safari




27

# Web Services

Blue Label Labs will design and develop your web services architecture (i.e., servers, storage and back-end code) in a way that is extensible for the future. We do not believe in building on a foundation of sand or on architecture that will have to be thrown away completely in the future.



## Servers, Storage & Back-End Code




28

## Web Services

## User Accounts

Permission based user accounts for authentication, data storage and functionality.

## Search

Users can search for doctors using algorithm filtering to determine the right doctor for the condition of the user

## Ratings

Users can rate doctors, and doctors can rate users.  Where needed, ratings are hidden to remove bias.

## Scheduling

Users can book appointments using block scheduling, tied to a calendaring solution (such as Google Cal)

## Messaging

Users receive email notifications of appointments and changes to their appointments



**Blue Label**
LABS

29

# Costs

## Phase 1
# Discovery & Product Planning

## Phase 2
# Design & Development

**Blue Label**
LABS

30

# Discovery & Product Planning - Sprint Cost

Discovery & Product Planning is when the foundations of the app are determined and tested. An iterative approach allow for frequent feedback cycles—resulting in the best possible product for your users. Not ALL designs are completed in this phase. The goal is to get the core flow and core value propositions designed and ready for development as quickly as possible. More design work continues in the next phase.

| | |
|---|---|
| Sr. Project Manager | 20 Hours / $175 per hour |
| Sr. User Experience Designer | 40 Hours / $221 per hour |
| Sr. User Interface Designer | 40 Hours / $221 per hour |
| Total | 100 Hours / Month |

Total — $21,000 per Month

**Blue Label**
LABS

31

# Design & Development - Sprint Cost

Design & Development starts as soon as our team, your team and (most importantly) your future users determine that enough of the design assets are ready to move to this phase. We break the development effort into Epics (i.e., groups of user stories that comprise a core flow or set of functionality). Development ends when we release the app into the wilds of the web or app store.

| | |
|---|---|
| Sr. Project Manager | 8 Hours / $175 per hour |
| Jr. Project Manager | 40 Hours / $125 per hour |
| Sr. User Experience Designer | 20 Hours / $221 per hour |
| Jr. User Interface Designer | 40 Hours / $176 per hour |
| Engineering Lead | 20 Hours / $221 per hour |
| Web Developer (2X) | 320 Hours / $54 per hour |
| Quality Assurance Staffer | 160 Hours / $32 per hour |
| Total | 608 Hours / Month |

## Total — $43,625 per Month

Blue Label
LABS

32

# Discovery & Product Planning Estimate

An estimated 1 month at $21,000 per month

+

# Design & Development Estimate

An estimated 4 months at $43,625 per month

---

# Total — $195,500



**Blue Label**
LABS



33

# Costs Not in this Estimate

 Apple Developer registration

$99 / year

 Google Developer registration

$25 / year

 GitHub Private Code Repository

$7 / month

 Domain name registration

$20 / year

 Amazon AWS Cloud Hosting or Similar

Roughly $100-$200 / month

 Stock Photography / Artwork / Imagery

Several $s per Image

Blue Label
LABS

Any costs related to 3rd party services not covered by this estimate

34

# Next Steps

35

# Leadership & Sales Teams

**Blue Label**
LABS



**Bobby Gill**
Co-Founder & CTO



**Jordan Gurrieri**
Co-Founder & COO



**Danny Deserto**
Creative Director



**Terri Lavelle**
Head of Program Management



**Zack Drew**
Head of Client Solutions



**Stewart Skrondal**
Director, Client Solutions

**Ashkan Eskandari**
Director, Client Solutions

**Bruce Morrison**
Director, Technical Client Solutions

36

# Why Blue Label?

At Blue Label Labs, we partner with the best entrepreneurs and businesses to solve everyday problems through a creative and conscientious use of technology.

Trusted by

   

Awards we've won

    

News Media Mentions

  



37

# Testimonials







Offering thorough education and engaged collaboration, Blue Label Labs worked as a committed partner, invested in project success. They're invested in their work with clients, beyond just a paycheck.

Mike Gayed
Founder & CEO @ HowUdish

Blue Label's team designed an exceptional app that has increased usage eightfold. In the first week of its launch, the app ranked No. 2 for news apps in iTunes.

Ashlin Ocampo
Product Manager @ iHeartRadio

In addition to delivering a top-notch product, Blue Label Labs is very proactive and organized when it comes to managing projects. Outside of software development, they've provided invaluable business development support–a welcomed surprise from a vendor in their industry.

Jeff Lyman
Founder & CEO @ Tonquin



38

# Let's get started!

Please provide the following information so we can draft our formal agreement:

## 1. Your Legal Company Name

## 2. Your Legal Company Address

Legal Company Name

Legal Company Address

Type of Company (e.g., LLC or C-Corp…)

State of Incorporation

## 3. Review Agreements

## 4. Sign Agreement & Pay Deposit

## 5. Kick-Off Meeting with Your New Team!

**Blue Label**
LABS

39

# Relevant
# Case Studies

Blue Label
LABS



# Case Study



# Disrupting the Prescription Drug Market

100-year old, NJ-based pharmaceutical company, G&W Laboratories knows a lot about prescription drug prices.

They wanted to put that knowledge to good use and came to Blue Label Labs to help them create a web app and a set of mobile apps to help individuals (plan participants) and companies (plan sponsors) save money.

By cutting out the middleman between plan sponsors and health insurance plans, Flipt is a platform that lowers costs by promoting price transparency and consumer choice while better aligning interests throughout the healthcare system.



  





Case
Study

# Improving the lives of those with lymphedema

Blue Label Labs was approached by two Ph.D./M.D.s who wanted support in designing a better way to measure and track lymphedema in patients. Lymphedema is a swelling of the limbs that is mainly a result of certain cancer therapies.

The set of apps we created provides fast, accurate, and reliable 3D imaging and measurement to monitor the progression of these geometric changes of limbs. LymphaTech's system is 99% accurate compared to water displacement for volume and tape measure for circumference.

No special training is required to scan. We developed this technology to provide easy scanning at home to increase the frequency of monitoring.







**3D ACQUISITION**

3D scans are taken with our handheld mobile device



**MEASUREMENT**

Volume, circumference, and percent difference are calculated



**ANALYTICS**

Changes in measurements are tracked over time





Case Study



# On-demand home healthcare partnering with leading providers

FriendHealth deploys multidisciplinary care teams to bring on-demand, in-home care to people that need it the most. Blue Label Labs lead the design and development of this set of web and mobile apps.

FriendHealth serves clinically complex populations with multiple chronic conditions by providing a differentiated level of access and care. The care teams are available 24/7/365 in-person and virtually.

FriendHealth works on behalf of leading health plans, health systems, and physician organizations to extend care delivery to the home and drive improved access to and quality of care, patient experience, and medical expense savings.

   









## Case Study

# Keeping Women's hearts healthy one app at a time

Heart disease is the number one killer of women. One woman dies every minute of heart disease in the US. That's 2-3x more than die of breast cancer and more deaths than caused by all cancers combined. Still women continue to be under diagnosed and under treated and the number of young women dying of heart disease is on the rise.

Enter Love My Heart, an app just for women that recognizes that women's hearts are unique and that women have different risks for heart disease than men.

Blue Label Labs developed this app alongside a set of cardiologists who specialize in women's cardiovascular disease at Columbia University Medical Center.

It was featured by Apple as a "Top Healthcare App" in 2018.



# EXHIBIT **B**

DocuSign Envelope ID: 89F9E3D5-AB4D-4399-8B45-9D5C75682DDE



## MASTER SERVICES AGREEMENT

This Master Services Agreement (the **"Agreement"**) is made and entered into as of the 21st day of January, 2020 (the **"Effective Date"**), by and between Blue Label Solutions, LLC, a Washington Limited Liability Company, d.b.a. Blue Label Labs (**"Developer"**), and Kalypsys, LLC a New Jersey Limited Liability Company, with corporate address at 12 Cobblestone Drive, Upper Saddle River, NJ, 07458 (the **"Customer"**), (Developer and Customer hereinafter referred to individually as a **"Party"** or collectively as **"Parties"**).


## AGREEMENT

1. **Scope of Services**.  Developer shall perform the services (the **"Services"**) described in the attached Statement(s) of Work (each, a **"SOW"**) to design and/or develop one or more custom software applications (the **"Software"**).  SOW No. 1, dated as of the Effective Date, and any subsequent SOWs, are attached hereto as **Schedule A**.  Customer shall cooperate with Developer's reasonable requests for any information and data necessary for the completion of the Software.  Customer understands and acknowledges that completion of the Software may be dependent upon Customer's provision of certain information, data, specifications, or content and that any delay in the provision of such information may delay the completion of the Software. Customer further understands and acknowledges that Developer may contract with third parties to assist in performance of the Services.

2. **Modifications**.  Modifications to the Software specifications shall be considered on a case-by-case basis. If Customer desires any modifications, additions, changes or updates to the Software that fall outside the scope of the specifications set forth in the SOW, Customer shall notify Developer in writing (including email). Developer shall then inform Customer of any changes to the fees and deliverables timelines the modifications would require. If Customer agrees in writing to the new terms Developer quotes, the writing shall be attached to this Agreement and its terms shall be incorporated into this Agreement. If Customer does not wish to accept the new terms, Customer shall notify Developer of the rejection as soon as possible and Developer will continue performance of the Services as originally agreed.

3. **Artwork and Content**.  Unless otherwise agreed in the SOW, Customer agrees to acquire and provide to Developer all images, logos, and textual descriptions for use in the Software (the **"Content"**). By delivering the content to Developer, Customer is warranting and representing that Customer has the lawful right to utilize the Content in the Software. Developer may, at Customer's request, provide assistance in acquiring or developing the Content.



4.  **Price and Payment Terms**.

    a.  <u>Fees</u>.  The fees for the Services and the due dates are set forth in the relevant SOW. Each fee installment constitutes a pre-payment for the Services to be provided in the following month.

    b.  <u>Invoices</u>.  Developer shall deliver an invoice (**"Invoice"**) to Customer on a monthly basis.  Each Invoice shall contain the amount due for the upcoming period, including any service fees which may have been charged pursuant to Section 4(0), herein.  Invoices shall be due and payable fifteen (15) days after issuance.

    c.  <u>Initial Installment</u>.  Developer will not begin performance of the Services until the relevant initial fee installment has been received.

    d.  <u>Late Payments</u>.  Any Invoices which are unpaid after their due date will be deemed a **"Unpaid Invoice"** and subject to a one and one-half percent (1.5%) service charge per month, or the maximum amount allowed by law, whichever is lower. If Customer does not remit payment including any and all late fees owed within thirty (30) days from the date it became due, Developer shall have the right to terminate this Agreement in accordance with Section 5.

    e.  <u>Development Conditioned on Timely Payment</u>.  Performance of the Services is conditioned upon timely receipt of payments and in the event of an Unpaid Invoice Developer may, in its sole discretion, stop performance of the Services until all Invoices are paid in full. Furthermore, Developer may cease provision of the Services if an Invoice is unpaid on the first day of the month following the date of the Invoice.

5.  **Termination**.

    a.  <u>Termination by Customer</u>.  Customer may terminate this Agreement at any time upon written notice to Developer, which termination notice must have an effective date not less than five (5) business days from the date of the notice.

    b.  <u>Termination by Developer</u>.  Developer may terminate the Agreement only for Cause (as defined herein).  The following events shall constitute **"Cause"**:

        i.  Failure by Customer to remit any payment owed Developer within thirty (30) days from the date such payment became due; or

       ii.  Any other material breach of this Agreement by Customer.

DocuSign Envelope ID: 89E9E3D5-AD4D-4899-8B45-0D5C75682DDF



c. <u>Effect on Invoices</u>.  Upon the effective date of a termination notice from Customer, or along with Developer's termination notice to Customer, Developer shall immediately cease all provision of the Services. Any unpaid Invoices must be paid in full, but no further Invoices will be issued and Customer shall not be responsible for any fee installments due after the effective date of the termination notice. Customer will not be entitled to a refund of any fees already paid.

d. <u>Ownership of Software upon Termination</u>. Upon the effective date of a termination notice and Customer's payment in full of all outstanding Invoices, title and interest in and to the incomplete Software as it then exists excepting any portions which are Background Technology (as defined herein) (the **"Incomplete Software"**), all throughout the universe for the full period of such rights including all renewals and extensions thereof, including all patents, copyrights, trade secrets, other proprietary rights and all rights of exploitation, shall be automatically assigned and transferred to Customer. If to any extent any of the aforesaid rights, title or interests are vested in Developer, Developer hereby irrevocably agrees that such rights, title or interests shall be immediately assigned by Developer to Customer on the terms set forth above.  Upon the effective date of a termination notice and Customer's payment in full of all outstanding Invoices, Developer hereby grants to Customer for no further consideration an irrevocable, non-exclusive, perpetual, transferable (and assignable without consent), sub-licensable (to any tier), worldwide, fully paid-up royalty-free license to use, reproduce, adapt, exploit in any way (as part of the Incomplete Software and any derivative thereof) and create (and own) adaptations and/or derivative works of the Background Technology as it is incorporated into Incomplete Software (and any derivative thereof), and all updates and revisions thereto, including for the purposes of completing the Software with a third party.

e. <u>Survival</u>.  Sections 7, 8, 9, 11, and 12 of this Agreement shall survive termination of this Agreement by either Party, and shall survive termination by any other means than election by either Party, including termination by court order.

6. **Developer Licenses**.  Customer agrees to use commercially reasonable efforts to acquire a developer license for the platform of choice as agreed upon by the Parties (the **"Developer License"**). If the Developer License is granted, Developer shall, upon receipt of final payment, submit the Software for publication on Customer's behalf. If Customer is not granted the Developer License for within sixty (60) days from Completion (as defined in the SOW), then, provided that Customer has fully paid all invoices, Developer shall deliver the Software to Customer for Customer's



own publication, and Developer shall have no further obligations with regard to publication. Customer acknowledges that once the Software is submitted for publication, the platform will then determine whether to publish the Software. Developer makes no guarantees that Software submitted for publication will be published.

7. **Ownership of Software**.  Development of the Software is for the benefit of Customer and  upon Completion and full payment, Customer shall solely own all rights, title and interest in and to the Software as a whole, excepting the Background Technology (as that term is defined herein), all throughout the universe for the full period of such rights including all renewals and extensions thereof, including all patents, copyrights, trade secrets, other proprietary rights and all rights of exploitation. If to any extent any of the aforesaid rights, title or interests are vested in Developer, Developer hereby irrevocably agrees that such rights, title or interests shall be immediately and automatically assigned by Developer to Customer on the terms set forth above.

8. **Ownership of Background Technology.**  Developer owns and/or holds rights to certain tools it uses in development, and that it shall retain ownership in after Completion, but will allow Customer to use it as a part of the Software. This material shall be referred to as **"Background Technology"**, and includes various preexisting common methods, application program interfaces, development tools, routines, subroutines and other programs, data and materials that Developer may include in the Software.

Developer retains all right, title and interest, including all copyright, patent rights and trade secret rights in the Background Technology.  Subject to full payment in accordance with Section 4, Developer grants to Customer an irrevocable, nonexclusive, perpetual worldwide, transferable (and assignable without consent), fully paid-up royalty-free  license to use, reproduce, adapt, exploit in any way (as part of the Software and any derivative thereof) and create (and own) adaptations and/or derivative works of the Background Technology as it is incorporated into the Software developed for and delivered to Customer under this Agreement (and any derivative thereof), and all updates and revisions thereto.  However, Customer shall make no other use of the Background Technology without Developer's written consent, and shall make no use of the Background Technology in any context other than as it is incorporated into the Software as delivered to Customer without Developer's written consent, which consent shall not be unreasonably withheld.

9. **Portfolio Rights**.  Customer hereby agrees to allow Developer to feature the final Software, including screen shots, Customer's name, name of the Software, description of the Software, and a link to enable purchase of the Software if



applicable, as part of the Developer's portfolio of work and for Developer's commercial and promotional purposes.  Customer may opt-out of this provision at any time by providing written notice to Developer requesting that the Software no longer be used for Developer's promotional purposes.

10. **Developer Warranties and Disclaimer.** Developer warrants that:

    a.  The Services and the Software do not infringe upon any rights including any and all patent, copyright, trademark, trade secret, or other form of Intellectual Property rights; and

    b.  The Services will be performed in a professional and workmanlike manner.

    THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY ORAL OR WRITTEN REPRESENTATIONS, PROPOSALS OR STATEMENTS MADE ON OR PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT.  DEVELOPER EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES.

11. **Indemnification**.  The Parties hereby indemnify and holds harmless each other, each other's affiliates, employees, officers, directors, and agents from and against all liability, damages, loss, cost or expense (including but not limited to reasonable attorneys' fees and expenses) arising out of or in connection with any actual or threatened claim, suit, action, or proceeding relating to any breach by Customer of its warranties hereunder including but not limited to claims relating to Content.  Without limiting the forgoing, Customer specifically indemnifies and shall defend and hold harmless Developer, its affiliates, employees, officers, directors, and agents from and against all liability, damages, loss, cost or expense (including but not limited to reasonable attorneys' fees and expenses) arising out of or in connection with any actual or threatened claim, suit, action or proceeding relating to the ownership in or the use or exploitation of the Content by Developer, including, but not limited to, any claim relating to the violation of any third party's trademark, copyright, patent, trade secret or other proprietary or personal rights in connection with the Content.

12. **Confidential Information.** Neither party shall knowingly disclose confidential nor proprietary information obtained from the other during the performance of this Agreement.  This includes, but is not limited to, customer lists, Customer-owned software or other technology, business plans, and information which a reasonable person would believe to be confidential. Each Party shall use at least the same degree (but no less than a reasonable degree) of care and protection, whether by instruction, agreement or otherwise, to prevent the unauthorized use, dissemination, copying or publication of any confidential information of the other Party as it uses to



protect its own information of a like nature.  Any material violation of this section entitles the injured party to seek injunctive relief to prevent irreparable harm. Each party shall return or destroy (at the owner's option), each other's confidential or proprietary information upon substantial performance under this Agreement.

13. **Non-Solicitation.** Developer's personnel are a valuable asset and are difficult to replace. Customer agrees that, during the term of this Agreement and for a period of one (1) year after its termination, Customer will not solicit, without the prior written consent of Developer, i) encourage, or induce any employee of Developer to leave his or her employment, or ii) offer employment or engagement (as an employee, independent contractor, or consultant) to any of Developer's employees. General advertisements not specifically directed at Developer's employees, or an offering employment to an employee responding to the same, shall not be prohibited by this Section 13.

14. **Miscellaneous Provisions.**

   a. **Mediation, Arbitration.**  If a dispute arises under this Agreement, the Parties agree to first try to resolve the dispute with the help of a mutually agreed-upon mediator located in New York, New York.  Any costs and fees other than attorney fees associated with the mediation shall be shared equally between the parties.

   If it proves impossible to arrive at a mutually satisfactory solution through mediation, the Parties agree to submit the dispute to binding arbitration in King County, Washington under the rules of the American Arbitration Association.  Judgment upon the award rendered by the arbitrator may be entered in any court with jurisdiction to do so.  On the written request of either Party for arbitration of such a claim pursuant to this paragraph, the Parties shall both be deemed to have waived the right to litigate the claim in any federal or state court.  To the extent that any claim or controversy arising out of this Agreement cannot be submitted to arbitration as set forth above, each Party hereby agrees that any suit, action or proceeding with respect to this Agreement and any transactions relating hereto, shall be brought in King County, Washington, and each of the Parties hereby irrevocably consents and submits to the jurisdiction of such Court(s) for the purpose of any such suit, action or proceeding.  Each of the Parties hereby waives and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it (he) is not personally subject to the jurisdiction of such Court; and, to the extent permitted by applicable law, any claim that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper or that this



Agreement or any replacements hereof may not be enforced by such Court(s).

b. **Choice of Law.**  This Agreement and its application shall be governed by the laws of the State of Washington.

c. **Notices.**  Whenever in this Agreement one Party is required to give notice to the other Party, such notice may be given personally, by first class mail registered or certified, postage prepaid, or by electronic means including facsimile or electronic-mail (e-mail).  Electronic communications shall be considered "written" for purposes of this Agreement.

d. **Severability.**  If any provision of this Agreement should be held to be invalid or unenforceable, then such invalidity or unenforceability shall not affect the other provisions of this Agreement which shall remain in full force and effect and shall not be in any way affected or impaired.  The Parties agree to attempt to substitute for any invalid or unenforceable provision a valid or enforceable provision which achieves to the greatest extent possible the same effect as would have been achieved by the invalid or unenforceable provision.

e. **Waiver.**  No failure or delay on the part of any of the Parties relating to the exercise of any right, power, privilege, or remedy provided under this Agreement shall operate as a waiver of such right, power, privilege, or remedy or as a waiver of any preceding or succeeding breach by the other Party, nor shall any single or partial exercise of any right, power, privilege or remedy preclude any other or further exercise of such or any other right, power, privilege or remedy provided in this Agreement, all of which are several and cumulative and are not exclusive of each other or of any other rights or remedies otherwise available to a Party at law or in equity. No waiver shall be valid unless in writing and signed by both Parties or their duly authorized representatives.

f. **Force Majeure:** Except with regard to payment obligations, either Party shall be excused from delays in performing or from failing to perform its obligations under this Agreement to the extent that the delays or failures result from causes beyond the reasonable control of the Party, including, but not limited to: default of subcontractors or suppliers; failures or default of third party software, vendors, or products; governmental actions after the Effective Date; strikes; terrorism or the threat of terrorism; communications, network/internet connection, or utility interruption or failure; fire; flood; epidemic; or acts of God or of the public enemy.

DocuSign Envelope ID: 89F9E3D5-AD4D-4399-8B45-0D5C75682DDF



g. **Entire Agreement.**  This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior oral or written agreements, understandings or arrangements between them relating to the subject matter of this Agreement.  No variation to this Agreement may be made except in writing signed by duly authorized representatives of both Parties.

h. **Relationship.**  Nothing contained in this Agreement shall constitute or imply a partnership, joint venture, agency, or fiduciary relationship between the Parties.

i. **Counterparts.**  This Agreement may be signed in any number of counterparts, all of which taken together shall constitute one and the same instrument.  Any Party may enter into this Agreement by signing any such counterpart and each counterpart shall be as valid and effectual as if executed as an original.

[*the remainder of this page intentionally left blank, signature page to follow*]



IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**BLUE LABEL SOLUTIONS, LLC**

By: Jordan Gurrieri

Its: Manager

**KALYPSYS, LLC**



By: David Chu    Amr Hosny

Its: Co Founder    Founder

9



## <u>Schedule A</u>

## Statement of Work No. 1

Blue Label Labs (**"Developer"**) and Kalypsys, LLC entered into a certain Master Service Agreement (**"MSA"**) on or about 01/14/2020, to which this Statement of Work (**"SOW"**) is attached. Any undefined capitalized terms used herein shall have the meanings set forth in the MSA.

This SOW sets forth the functional specifications and other information relating to the Software which Developer will develop and create for Customer.

SECTION 1: FEE INSTALLMENTS

i.   **Discovery & Product Planning**
     1.  Installment 1: $21,000 due 02/03/2020. Must be received before work will begin.

ii.  **Design & Development**
     2.  Installment 2: $43,625 due 03/03/2020.
     3.  Installment 3: $43,625 due 04/03/2020.
     4.  Installment 4: $43,625 due 05/03/2020.
     5.  Installment 5: $43,625 due 06/03/2020.

Estimated Total Cost: $195,500

Please note that above Installments and Estimated Total Cost are subject to change should the scope of work change. In that event, we will provide you with an updated Fee Installment schedule for your approval.

SECTION 2: DELIVERABLES

The Developer agrees to produce and complete for the Customer the following components as part of this Statement of Work:

i.   **Estimated Timeline: 5 months**

ii.  **Design & Development of User Stories denoted "V1" within Column D:**
     •   http://bit.ly/357MEIi

iii. **Completion.** As used in this SOW, **"Completion"** means the date that the software application is submitted to Web Deployment Staging. Upon Completion the software application will be ready for submission to Web Deployment Production for publication.



Any dates for deliverables contained herein are estimates and may vary. Completion of the Software may be dependent, in part or in whole, upon Customer's provision of certain information, data, specifications, or content and that any delay in the provision of such information may delay the completion of the Software.

Signed and Agreed to by:

**BLUE LABEL SOLUTIONS, LLC**

DocuSigned by:

*Jordan Gurrieri*

FF04AD750400417...

By: Jordan Gurrieri

Its: Manager

**KALYPSYS, LLC**



| DocuSigned by: | DocuSigned by: |
|---|---|
| *David Chu* | *Amr Hosny* |
| 2FF2192323294FB... | 7B9DA729805542F... |

By: David Chu          Amr Hosny

Its: Co Founder          Founder

11



**Schedule B**

**Background Technology**

1. User login and authentication (Email/Facebook/LinkedIn/Instagram)
2. Password reset
3. Mandrill/SendGrid Email Notifications
4. Apple/Google push notification integration
5. Braintree/Stripe/PayPal marketplace payment integration
6. Amazon S3 file upload/download
7. Developer provided object ranking, sorting and prioritizing algorithms
8. Google Places/Google Maps and Apple Maps location services
9. Booker appointment scheduling integration
10. Clover POS integration
11. Amadeus flight details, booking and tracking integration